UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GUIDEHOUSE INC., ) | |
| ) | |
| Plaintiff, ) | No. 1:24-CV-12176 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| CONTINENTAL CASUALTY COMPANY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Guidehouse Inc. sued its insurer, Continental Casualty Company, for breach of an insurance policy after Continental denied a claim for the cost of a settlement with the Department of Justice. R. 1, Compl.[1] Guidehouse filed its suit in this District, where Continental is based. Compl. ¶ 3, 5. But Continental filed a motion to transfer venue to the Eastern District of Virginia, where Guidehouse is based. *Id.* ¶ 2; R. 19, Def.'s Mot. For the reasons discussed in this Opinion, the motion to transfer is granted.

**I. Background**

To set the factual stage, the Opinion draws the allegations from the Complaint. *See* Compl. Continental issued an Enterprise Liability Policy to Guidehouse for the period covering October 2022 to October 2023 ("Policy"). *Id.* ¶ 29; R. 1-3, Exh. C, Policy

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. This Court has subject matter jurisdiction under diversity jurisdiction. 28 U.S.C. § 1332(a). Complete diversity is met: Guidehouse is a citizen of Delaware and Virginia, and Continental is a citizen of Illinois. Compl. ¶¶ 2–3. The amount-in-controversy requirement is met because Guidehouse seeks to recover costs for defending itself in a *qui tam* lawsuit that ended with a $7.6 million settlement payment. *Id.* ¶ 24.

at 1. The Policy includes technology and professional-liability coverage, and privacy-regulation investigation expense coverage. Compl. ¶ 31; Policy at 1. The Policy also includes a carve out from its coverage ("Deliberate Acts Exclusion") for claims based on a "dishonest, fraudulent, criminal or malicious act or omission, commingling, misappropriation or misuse of funds, intentional wrongdoing or knowing violation of any contract or agreement by or on behalf of [Guidehouse]." Compl. ¶ 40; Policy at 14–15. The Policy's total maximum retention is $5,000,000. Compl. ¶ 32; Policy at 1.

In 2021, Guidehouse entered into a contract with the New York Office of Temporary and Disability Assistance to help administer New York State's emergency rental-assistance program (known in housing circles as ERAP) as established by Congress. Compl. ¶¶ 7–9. The participating states implementing ERAP were required to take certain steps to safeguard the personally identifiable information of the landlords and tenants applying to the program. *Id.* ¶ 8. Guidehouse was to be the "prime contractor," tasked with developing the technology and online platform used by applicants to apply for state rental assistance. *Id.* ¶ 9. The portal went live in June 2021—but just 12 hours after its launch, it was shut down because certain applicants' personally identifiable information had been exposed. *Id.* ¶ 11.

In February 2023, the DOJ issued a Civil Investigative Demand (commonly known by its acronym, CID) to Guidehouse to investigate the June 2021 privacy incident. *Id.* ¶ 12. The CID was issued under the False Claims Act, 31 U.S.C. §§ 3729–3733, and sought documents and answers related to the company's cybersecurity and compliance with the terms of the ERAP contract. *Id.* In particular, the DOJ was

investigating allegations that Guidehouse (and its subcontractor) submitted or caused the submission of false claims in connection with their assistance in the implementation of the program. Compl. ¶ 13. About a year later, the DOJ issued a second CID to Guidehouse seeking information about the company's implementation of ERAP and other cybersecurity insight. *Id.* ¶ 18. At this time, the DOJ also disclosed to Guidehouse that the CIDs were connected to a *qui tam* complaint by a then-anonymous relator.[2] *Id.* ¶ 17; R. 1-1, Exh. A, Relator's Compl.

Guidehouse provided notice of the CIDs to its insurer, Continental, and Continental accepted the notices as a Notice of Circumstance. Compl. ¶¶ 14–15; 18–19. Guidehouse then entered into settlement talks with the DOJ. *Id.* ¶ 21. The DOJ gave Guidehouse a redacted copy of the *qui tam* complaint, which alleged that Guidehouse had rushed to win the contract with the State of New York, and used outdated software with inadequate security protections that it hid from New York. *Id.* ¶¶ 21–23; *see also* Relator's Compl. at 13–17. In May 2024, Guidehouse and the DOJ entered into a settlement agreement. *Id.* ¶ 24; *see also* R. 1-2, Exh. B, Settlement Agreement. Guidehouse agreed to pay $7.6 million plus interest and the relator's attorney's fees of $50,000. Compl. ¶ 24. The Settlement Agreement sets forth the conduct that it covers, which includes an "information security breach" and use of "unauthorized software." Settlement Agreement ¶¶ A–K. The Agreement does not make any

---

[2]The relator was later revealed to be Elevation 33, LLC. Compl. ¶ 21; Relator's Compl. at 1.

3

statements or admissions establishing that Guidehouse committed any dishonest, fraudulent, or knowing acts or violations. Compl. ¶¶ 26–27.

In August 2024, Guidehouse requested reimbursement from Continental for the costs of defending and settling the matter with the DOJ. Compl. ¶ 41. Continental denied the claim, arguing that the "gravamen of the Qui Tam Civil Action is that Guidehouse made intentional and deliberate misrepresentations … and, then, knowingly hid the noncompliance from New York State." *Id*. ¶¶ 42–43. According to Continental, this amounted to allegations of fraudulent acts or knowing violations of contracts under the meaning of the Deliberate Acts exclusion. *Id*. ¶ 43. So Guidehouse has now sued Continental for breach of contract, asserting that the *qui tam* action and ensuing Settlement were covered under its insurance Policy and demanding that Continental pay the costs of defending the action and indemnify it for the Settlement amount. *See generally* Compl.

## II. Legal Standard

A district court may "transfer any civil action to any other district or division where it might have been brought" for "the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). In deciding whether to transfer venue, courts consider whether (1) venue is proper in both the transferor and transferee courts; (2) the transferee district would be more convenient for the parties and witnesses; and (3) transfer would serve the interest of justice. *Gueorguiev v. Max Rave, LLC*, 526 F. Supp. 2d 853, 856 (N.D. Ill. 2007). Weighing the factors for and against transfer "necessarily involves a large degree of subtlety and latitude, and, therefore,

is committed to the sound discretion of the trial judge." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986); *see id.* at 219 n.3 ("[I]t should be noted that the language of § 1404(a) does not indicate the relative weight to be accorded each factor."). The party seeking transfer bears the burden of establishing "that the transferee forum is clearly more convenient." *Id.* at 219–20.

### III. Analysis

Continental asserts that venue is proper in both this District and in the proposed transferee district. Def.'s Mot. at 3–4. Guidehouse does not dispute this. R. 26, Pl.'s Resp. at 7 n.4.[3] The Court agrees that venue is proper in both districts under 28 U.S.C. § 1391(b): the sole defendant in this case, Continental, resides in this District, and Guidehouse's principal place of business is in Virginia, where the specific events underlying the settlement agreement at issue in this case presumably took place. *See* Compl. ¶¶ 2–3, 24–28. So both districts are proper venue candidates. The key questions are whether transfer to the Eastern District of Virginia would provide more convenience and would serve the interest of justice. After assessing these two considerations, the Court concludes that both weigh in favor of transfer.

---

[3]Though Guidehouse does not advance an argument that venue would be *improper* in the Eastern District of Virginia, it expresses skepticism regarding whether Continental "has met its burden of showing" that a substantial part of the events giving rise to this dispute occurred in EDVA. Pl.'s Resp. at 7 n.4. Because Guidehouse does not argue that the Eastern District of Virginia would be an improper venue under 28 U.S.C. § 1391(b), the Court likewise focuses its attention on the remaining aspects of the transfer analysis.

### A. Convenience of the Parties and Witnesses

In assessing convenience of the parties and witnesses, "courts generally consider the availability of and access to witnesses," "each party's access to and distance from resources in each forum," "the location of material events," and "the relative ease of access to sources of proof." *Research Automation, Inc. v. Schrader–Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010). When there is a tie—that is, "the inconvenience of the alternative venues is comparable,"—the plaintiff's choice of forum serves as the tiebreaker. *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 665 (7th Cir. 2003).

### 1. Witnesses

The convenience of the witnesses is the factor most strongly favoring transfer in this case, though even this factor is a close call. Continental, as the party seeking transfer, must "clearly specify the key witnesses to be called and make at least a generalized statement of what their testimony will include." *Hirst v. SkyWest, Inc.*, 405 F. Supp. 3d 771, 778 (N.D. Ill. 2019) (cleaned up).[4] Continental argues that Virginia would be more convenient for the witnesses because "the majority of relevant witnesses are located in Virginia." Def.'s Mot. at 6. In support of this contention, it lists three employees of Guidehouse located in Virginia that are named in the *qui tam* complaint and asserts that Continental intends to depose them. *Id.* at 7. According to

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

6

Continental, these potential witnesses may be able to weigh in on the nature of the covered conduct settled by the DOJ and Guidehouse and whether the higher-ups at Guidehouse knew about the potential for privacy incidents before the online portal went live. *Id.* at 7–8. Guidehouse responds that discovery and depositions of witnesses is "not likely to be necessary" because the outcome of this case will be determined primarily on the interpretation of the Policy itself alongside the Settlement Agreement. Pl.'s Resp. at 11. To support this contention, Guidehouse cites Seventh Circuit precedent holding that insurance-coverage disputes are not the proper forums to "try[] the merits" of potential claims against an insured party. *Id.* (quoting *Astellas US Holding, Inc. v. Fed. Ins. Co.,* 66 F.4th 1055, 1074 (7th Cir. 2023)). Guidehouse also argues that the Settlement Agreement for which it seeks indemnification is cabined only to the Covered Conduct, and none of the Virginia-based witnesses identified by Continental have knowledge of that. *Id.* at 12. To Guidehouse's way of thinking, Continental does not argue that any of the Virginia-based witnesses could opine on the negotiations or the intent of the parties when they entered the Settlement Agreement, so it supposedly would not be necessary to depose them in this case. *Id.*

To resolve these competing visions of where the relevant witnesses are located, the Court must first determine what would be the allowable scope of discovery under the pertinent state laws governing this insurance-coverage dispute. And to do that, the Court must determine which state's substantive law applies to the case. To start, the Policy itself does not include a choice-of-law provision. *See generally* Policy. But both parties agree that Virginia law governs the interpretation of the Policy, and the

7

Court agrees. Compl. ¶ 48; Def.'s Mot. at 11. To get there, the first step is acknowledging that a "federal court sitting in diversity jurisdiction typically applies the choice-of-law rules of the state in which it sits." *Dobbs v. DePuy Orthopedics, Inc.,* 842 F.3d 1045, 1048 (7th Cir. 2016). So Illinois choice-of-law rules apply here. "Under those rules, an insurance policy is generally governed by the law of the state where the policy was issued or delivered or by the law of the place of the last act to give rise to a valid contract." *U. S. Fire Ins. Co. v. CNA Ins. Cos.,* 572 N.E.2d 1124, 1127 (Ill. App. Ct. 1991). Here, the Policy was delivered to Guidehouse in Virginia, where it has its principal place of business. Compl. ¶ 2. Presumably, Virginia is also where Guidehouse made the decisions underlying this dispute, such as submitting claims to Continental and entering the Settlement Agreement. So Virginia substantive law will govern the coverage dispute in this case.

Turning now to whether witnesses are appropriate in this type of coverage dispute under Virginia law, it is important to note that Guidehouse is claiming that Continental had *both* a duty to defend it in the *qui tam* suit, as well as a duty to indemnify it after the fact. *See* R. 28, Pl.'s Br. for Judgment on the Pleadings at 5–8. "Virginia law … recognizes that the duty to defend is broader than the duty to indemnify." *Bohreer v. Erie Ins. Grp.,* 475 F. Supp. 2d 578, 584 (E.D. Va. 2007) (citing *VEPCO v. Northbrook Property & Cas. Ins.*, 475 S.E.2d 264, 265 (Va. 1996)). Under Virginia law, an insurer has a duty to defend an insured when the complaint "alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." *Id.* at 584 (cleaned up). By contrast, the duty to indemnify refers to "an

8

insurer's responsibility to pay a monetary award when its insured has become liable for a covered claim." *Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 513 (E.D. Va. 2011) (cleaned up). When both the duty to defend and the duty to indemnify are at issue, analysis begins with the duty to defend; this is so because an insurer with no duty to defend logically cannot have a duty to indemnify. *Bohreer*, 475 F. Supp. 2d at 584. But an insurer with a duty to defend may not necessarily also have a duty to indemnify the insured when the suit is over, depending on the facts gleaned through discovery or at trial in the underlying case. *Id.*

To assess the duty to defend, Virginia courts employ the "eight corners rule" by comparing the policy agreement with the underlying complaint to determine whether any allegations assert conduct that would be covered by the policy. *Erie Ins. Exch. v. State Farm Mut. Auto. Ins. Co.*, 2002 WL 32075410, at *5 (Va. Cir. Ct. Dec. 16, 2002). Because this is often done at the outset of an underlying lawsuit, it makes sense to cabin the analysis to the pleadings, disregarding external facts gleaned from discovery. So, on this point, Guidehouse is correct that it would be improper—under Virginia law—to allow fact discovery and witness depositions to determine whether Continental had a duty to defend it in the *qui tam* action. If the analysis ended there, then this factor would not tip one way or another.

But the same cannot be said of the duty to indemnify. Instead, in suits with underlying settlement agreements that may have settled *both* covered and non-covered conduct under a policy, courts consider "a variety of factors short of a full trial of the original suit." *Perdue Farms, Inc. v. Travelers Cas. & Surety Co. of Am.*, 448

9

F.3d 252, 264 (4th Cir. 2006) (applying Maryland law, but based on a principle that also applies under Virginia law). This is because the key indemnification inquiry after a settlement is whether *claims* of insurable conduct formed the basis of the settlement payout, which may not always be clear from the face of the settlement agreement itself. *Panel Sys., Inc. v. Selective Ins. Co. of Am.*, 2019 WL 921458, at *11–12 (E.D. Va. Feb. 25, 2019). Thus, "when a policyholder settles both covered and non-covered claims for a single lump sum, and the settlement agreement does not fully indicate how liability was allocated between them, a court must engage in a factual inquiry to apportion the settlement amounts between the covered and non-covered claims." *Capitol Env't Servs., Inc. v. North River Ins. Co.*, 778 F. Supp. 2d 623, 635 (E.D. Va. 2011) (cleaned up).[5] Thus, if Continental is found to have a duty to defend Guidehouse under the eight corners of the *qui tam* complaint and resulting settlement, then evidence will be permitted in the indemnification analysis to determine what claims formed the basis of the Settlement Agreement. At that point, witness testimony may be necessary—particularly where, as here, the factual record of the underlying action is thin.

Of the four witnesses Continental identifies, three reside in Virginia. Def.'s Mot. at 6–8. Guidehouse counters that most of these witnesses "have no connection

---

[5]The parties devoted a considerable portion of the briefing to this issue, specifically focusing on the impact of the Seventh Circuit's words in *Astellas* on the propriety of litigating the underlying claims in a subsequent insurance coverage dispute. *See* Pl.'s Resp. at 11–12; Def.'s Reply at 5–6; *Astellas*, 66 F.4th at 1069. This Court notes that *Astellas,* though informative, applied Illinois state law, not Virginia law. 66 F.4th at 1060. But even *Astellas* considered testimony from the insured's lead counsel in the underlying action to determine whether the settlement in that case was covered by the policy. *Id.* at 1076.

to the 'Covered Conduct,'" Pl.'s Resp. at 12 (citing R. 26-1, O'Brien Decl.), and so their testimony would not be relevant to the key issue in this case on the nature of the settled claims. But the central question is which *claims* formed the basis of the Agreement and whether those claims are covered. So the key witnesses to consider are ones with personal knowledge of the *settlement*, not necessarily witnesses with personal knowledge of the Covered Conduct.

The attorneys that signed the Settlement Agreement itself hail from the Department of Justice's Commercial Litigation Branch, the U.S. Attorney's Office for the Northern District of New York, and law firm offices in D.C. and New York. *See* Settlement Agreement at 12–14.[6] Individuals employed by Guidehouse (based in Virginia) and Elevation 33, LLC (at least somewhat based in Wyoming)[7] also signed the Agreement. *Id.*; Compl. ¶ 2; Relator's Compl. ¶ 8. This tips in favor of transfer, as Virginia would be the more convenient forum for the D.C. and Virginia-based

---

[6]A quick internet search of the attorneys' names confirms the offices in which each one works. *See* Jones Day, J. Andrew Jackson, https://www.jonesday.com/en/lawyers/j/j-andrew-jackson?tab=overview (last visited Sept. 22, 2025) (D.C.); Nixon Peabody, Tina Sciocchetti, https://www.nixonpeabody.com/people/sciocchetti-tina (last visited Sept. 22, 2025) (New York); Morrison Foerster, Tina D. Reynolds, https://www.mofo.com/people/tina-reynolds (last visited Sept. 22, 2025) (D.C.); Buffone Law Group, Sam Buffone, https://buffonelawgroup.com/our-team/sam-buffone/ (last visited Sept. 22, 2025) (D.C.).

[7]It is not entirely clear to the Court where the two signatories for Elevation 33 reside. Elevation 33 is apparently "a limited liability company organized in the State of Wyoming," with an office (and registered agent) in Wyoming, suggesting that at least one of the members lives in Wyoming. Relator's Compl. ¶ 8. But the declaration submitted by Guidehouse partner Chris O'Brien suggests that Elevation 33 is "owned by two former Guidehouse employees based in the Washington, D.C. area." O'Brien Decl. ¶ 6. If it is the case that these two signatories reside in the D.C. area, then this would further favor transfer.

witnesses. Also, although the parties point to one Illinois-based Guidehouse employee as a potential witness, courts are more concerned about the burden that trial might impose on *non*-party witnesses than the burden on a party's employee, who presumably "will appear voluntarily."[8] *Lewis v. Grote Indus., Inc.,* 841 F. Supp. 2d 1049, 1054 (N.D. Ill. 2012); Def.'s Mot. at 8; Pl.'s Resp. at 12. Thus, because several of the potential witnesses that participated in the Settlement Agreement are in the Virginia area, and none are in Illinois, Virginia is the more convenient forum—albeit by a modest margin.

### 2. Access to Records and Resources

Turning to the parties' convenience, Continental bears the "burden of showing that the original forum is inconvenient for the defendant and that the alternative forum does not significantly inconvenience the plaintiff." *Rudy v. D.F. Stauffer Biscuit Co., Inc.,* 666 F. Supp. 3d 706, 717 (N.D. Ill. 2023) (cleaned up). Nowadays, the wide availability of air transportation and electronic document transmission "make it easy" to litigate cases "with little extra burden in any of the major metropolitan areas." *Bd. of Trustees, Sheet Metal Workers Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037 (7th Cir. 2000). Nevertheless, courts "should bear in mind the

---

[8]Guidehouse states that "to the extent witness testimony is relevant," it will "produce its own witnesses in Chicago for trial and deposition by virtue of litigating in this forum." Pl.'s Resp. at 12. This is based on the fact that the four potential witnesses identified by Continental are Guidehouse employees. Def.'s Mot. at 7–8. Even if it is the case that these witnesses can testify as to which claims the parties based the Settlement Agreement on, there is no guarantee that these individuals will work for Guidehouse indefinitely, so by the time of trial, they will not necessarily be subject to Guidehouse's direction, let alone the Court's subpoena power.

12

parties' respective residences and their ability to withstand the expenses of litigating in a particular forum." *Tingstol Co. v. Rainbow Sales, Inc.*, 18 F. Supp. 2d 930, 934 (N.D. Ill. 1998) (cleaned up).

Continental argues that Virginia is more convenient because that is where Guidehouse is located. Def.'s Mot. at 8–9. Guidehouse does not counter that Virginia is actually less convenient for it; the company merely points out that Continental's analysis on this factor is scant and questions why Continental seeks to move out of its home venue in favor of Virginia. Pl.'s Resp. at 12–13. Because the choice of either district would mean that one party will be litigating close to home and another will be litigating out of state, this factor is neutral. Also, where both parties are large corporations with national presence, it is unlikely—and neither party has argued—that one or the other is "better able to bear the expense of litigating" far from home. *See Heller Fin., Inc. v. Riverdale Auto Parts, Inc.* 713 F. Supp. 1125, 1131 (N.D. Ill. 1989). On balance, this aspect neither weighs for or against transfer.

### 3. Relative Ease of Access to Evidence

Access to evidence is likewise neutral. Courts have recognized that "where records are actually stored is less of a factor because documents now are easily scanned, stored, and electronically transmitted and moving them no longer creates the onerous burden it may once have imposed." *Hirst*, 405 F. Supp. 3d at 778 (cleaned up); *see also First Nat'l Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 912 (N.D. Ill. 2006) ("When documents are easily transferable, access to proof is a neutral factor."). Continental argues that "[s]ince the majority of [the documents produced in response to

the CIDs] are presumably physically located or otherwise stored in Virginia, this factor tips in favor of Virginia." Def.'s Mot. at 6. But Continental recognizes that "the evidence primarily consists of easily transferable documents." *Id.* Guidehouse counters that "most of the documents produced in response to the CIDs were produced by Guidehouse from its offices in Chicago and New York, not in Virginia." Pl.'s Resp. at 11. But it concedes that any evidence would be easily transferrable. *Id.* Because neither party asserts that there exists any physical evidence that would pose an issue to litigating in either forum, this factor neither weighs for or against transfer.

### 4. Location of Material Events

The site of relevant events is also a wash. For purposes of venue, the situs of material events "is the location where the defendant's decisions and activities that gave rise to the claim took place." *Rudy*, 666 F. Supp. 3d at 716 (cleaned up). "The location of material events underlying an alleged breach of an insurance contract include where the business decisions leading up to and causing the breach occurred and the location of performance or non-performance under the contract." *Williams v. State Farm Mut. Auto. Ins. Co.,* 678 F. Supp. 3d 980, 1004 (N.D. Ill. 2023) (cleaned up). Also, the place where the policy was "solicited, negotiated, delivered, and executed" likewise warrants consideration. *Id.* (cleaned up).

Continental argues that "this District bears no relationship to where the Policy was delivered or any of the facts giving rise" to the *qui tam* action occurred. Def.'s Mot. at 5. Guidehouse responds that the "majority of the material events underlying the settlement between Guidehouse and the United States, as well as dealings

14

between the parties, occurred in Chicago and New York, not Virginia, weighing against transfer." Pl.'s Resp. at 9. According to Guidehouse, the Policy was negotiated, issued, and executed in Chicago and New York. *Id.* It also asserts that Chicago is where Continental made the choice to deny coverage, causing the breach. *Id.* at 9–10. Finally, Guidehouse argues that the Covered Conduct—that was released in the Settlement Agreement and that it now seeks indemnity for—occurred in "Chicago and/or New York, not in Virginia." *Id.* at 10 (citing O'Brien Decl. ¶¶ 2, 5, 8–14).

But the pertinent events in this case have more to do with the underlying Settlement Agreement than with the solicitation and execution of the Policy itself. Continental's choice to deny coverage did presumably occur in its Chicago headquarters, so it cannot be said that this district "bears no relationship," Def.'s Mot. at 5, to the present action. But the Policy was delivered to Continental in its Virginia headquarters, and it references Virginia briefly, Policy at 1–2, as does the "Cancellation/Nonrenewal Endorsement." *See* R. 1-3, ECF page 37. Although these passing references to Virginia, on their own, do not strongly favor transfer, neither does the fact that Continental denied coverage from its Chicago office, where it presumably makes most of its business decisions. And although at least some of the Covered Conduct allegedly happened in Chicago, O'Brien Decl. ¶ 5, this is still less relevant than the actual negotiation that led to the Settlement Agreement, which likely took place closer to the Northern District of New York. Thus, on balance, the location of material events neither favors nor disfavors transfer.

### 5. Plaintiff's Choice of Forum

In sum, the factors discussed above ultimately show that Virginia is the more convenient forum—albeit modestly—for the potential non-party witnesses. Guidehouse, however, asserts that its choice of forum is entitled to deference. Pl.'s Resp. at 7–9. Continental counters that Guidehouse's choice of forum should not receive any deference because it was the "product of impermissible forum shopping." Def.'s Mot. at 5. But as discussed previously, both this venue and the transferee venue are proper, and "plaintiffs are ordinarily allowed to select whatever forum they consider most advantageous." *Atl. Marine Const. Co., Inc. v. U. S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (1947). It is true that the plaintiff's choice is a tiebreaker when the inconvenience of the venues is comparable, *Nat'l Presto Indus.*, 347 F.3d at 665, and the fact that Guidehouse prefers to litigate in this District does not negate that general principle. But there is no tie here—the convenience factors do favor transfer—and the relatively light deference towards Guidehouse's choice is insufficient to tip the balance.

### B. Interest of Justice

Although transfer would serve the convenience of the parties and witnesses, the Court still must consider whether transfer would serve the "interest of justice." *See Coffey*, 796 F.2d at 220 (noting that the interest of justice "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result"). The interest-of-justice element of the transfer analysis is about "the efficient administration of the court system." *Rsch. Automation*, 626 F.3d at 978.

Considerations include "docket congestion and likely speed to trial in the transferor and potential transferee forums," "each court's relative familiarity with the relevant law," the "respective desirability of resolving controversies in each locale," and "the relationship of each community to the controversy." *Id.*

First, docket congestion favors transfer. Continental points out that the Eastern District of Virginia is a "rocket docket," and this District is not. *See* Def.'s Mot. at 9–10 (citing Hunton, *After A Brief Hiccup, The 'Rocket Docket' Soars Back To No. 1*, hunton.com/insights/publications/after-a-brief-hiccup-the-rocket-docket-soars-back-to-no-1 (June 25, 2024) (noting that the Eastern District of Virginia is known as "the nation's fastest or second-fastest civil trial court")). In support, Continental points to data showing that the median number of months from filing to trial in this District is 61.3, while in the Eastern District of Virginia it is 14.3. Def.'s Mot. at 9 (citing U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, September 2024, *available at* https://www.uscourts.gov/sites/default/files/2024-12/jb_c5_0930.2024.pdf). Guidehouse counters that the more relevant statistic is median number of months from filing to disposition, which is 6.8 months in this District and 5.3 months in Eastern District of Virginia. Pl.'s Resp. at 13–14; U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, September 2024, *available at* https://www.uscourts.gov/sites/default/files/2024-12/jb_c5_0930.2024.pdf.

The Court agrees that time to disposition is typically the more relevant indicator, given that civil cases go to trial infrequently. *See, e.g.*, *Bureau of Consumer Fin.*

17

*Prot. v. Fifth Third Bank,* 2021 WL 534658, at *5 (N.D. Ill. Feb. 12, 2021) ("Since cases often do not proceed to trial, … courts have held that the time to disposition is the more important metric." (cleaned up)). But the median time to trial still bears some weight, especially when the difference is quite stark, as it is here: the median time from filing to trial is almost four *years* shorter in Virginia. So docket congestion favors transfer.[9]

The courts' relative familiarity with the relevant law likewise favors transfer. In this particular case, this is the most weighty factor in favor of transfer. As discussed earlier, Virginia insurance law governs this case. *See supra* 6–11. Federal courts sitting in diversity jurisdiction apply the substantive laws of other states with some regularity. *Hirst*, 405 F. Supp. 3d at 779–80 ("Facing unfamiliar state law claims is business as usual in the federal courts."). But, as evidenced by the analysis of the witness-convenience factor, this case involves a nuanced area of insurance law—and a district court should be more familiar with the law of the state it is sitting in than the law of another. It is thus sensible for a district court sitting in Virginia to decipher the contours of the indemnification analysis under Virginia law (including

---

[9] Guidehouse points out that this Court's "median time to outcome for contract cases is 141 days (approximately 4.6 months), which is shorter than the median time to disposition in both districts." Pl.'s Resp. at 14. It gathered this data using Westlaw Litigation Analytics, *see id.* at 14 n.7. Although it is true that legal-research services now provide more granular statistics on individual judgeships within a District, it is not clear how the data is collected and analyzed. For example, does this number include all settlements where the Court may not have issued a decision aiding the disposition? Does it count *any* contracts case, even those where the contractual dispute is ancillary to another area of the law (for example, employment cases)? Given these uncertainties, the Court discounts the importance of that analytical tool in a transfer analysis.

18

how much factual development and discovery should be permitted by Virginia courts in a coverage dispute). Indeed, that question alone is a close call and the Court has no doubts that the Eastern District of Virginia will take a closer look when it evaluates the motion for judgment on the pleadings.

Finally, the Court must consider the respective desirability of resolving controversies in each locale, accounting for the relationship of each community to the controversy. The Eastern District of Virginia has a modestly greater interest in resolving a controversy in which a Virginia-based company is seeking indemnity—for an underlying suit where it was accused of wrongdoing—under a Policy that was delivered to it in Virginia. Guidehouse argues that Illinois has a stronger interest "in making sure one of the largest insurance companies headquartered in Chicago is appropriately deciding coverage issues under the policies it issues in Illinois." Pl.'s Resp. at 15. But Continental does business nationwide despite its home base being in Chicago, and so any local interest in its coverage disputes is weakened by that fact—especially when the central issue here concerns the Settlement Agreement entered into by a Virginia-based company. In light of the potentially nuanced issue of Virginia insurance law and Virginia's interest in its public policy, it would serve the interests of justice to transfer this case to the Eastern District of Virginia.

### IV. Conclusion

On balance, the convenience to the non-party witnesses and the interest of justice weigh in favor of transfer. Continental's motion to transfer this case, R. 19, is granted. The Court orders that the case be transferred forthwith to the Eastern

District of Virginia. The motion for judgment on the pleadings is terminated without prejudice to refiling after the transfer is effectuated.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 23, 2025